Andrew S. Friedman (005425)
Francis J. Balint, Jr. (007669)
William F. King (023941)
BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
2325 East Camelback Road, Suite 300
Phoenix, AZ 85016
afriedman@bffb.com
fbalint@bffb.com
bking@bffb.com
Telephone: (602) 274-1100
Fax: (602) 274-1199

John P. Leader, Esq. (012511)
LEADER LAW FIRM
405 W. Cool Drive, Suite 107
Tucson, AZ  85704
john@leaderlawaz.com
Telephone: (520) 575-9040
Fax: (520) 575-9340

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard J. Labrecque, on behalf of Himself and Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NewRez LLC, f/k/a New Penn Financial, LLC, d/b/a Shellpoint Mortgage Servicing,<br><br>Defendant. | Case No. 2:16-cv-02696-PHX-SRB<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Richard J. Labrecque ("Plaintiff"), by and through his attorneys, brings this Complaint against Defendant NewRez LLC, f/k/a New Penn Financial, LLC, d/b/a Shellpoint Mortgage Servicing ("Shellpoint"), on behalf of himself and all other similarly situated persons with non-delinquent mortgage escrow accounts serviced by Shellpoint in which Shellpoint failed to timely pay taxes and then used escrow funds to reimburse itself for expenses incurred due to Shellpoint's own misconduct.

## PARTIES

1. Plaintiff is, and at all times mentioned herein was, a resident and citizen of Pima County, Arizona.

2. Shellpoint is mortgage servicing company licensed to do and doing business as a mortgage banker in Arizona.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over the subject matter of this action pursuant to 12 U.S.C. § 2614 and 28 U.S.C § 1367.

4. Venue is proper in this Court pursuant to 28 U.S.C § 1361.

## FACTUAL ALLEGATIONS

5. In March 2018, Plaintiff re-financed a residential property located in Pima County, Arizona ("the Home") by way of a residential mortgage loan from Quicken Loans, Inc. ("Quicken").

6. The terms and conditions governing Plaintiff's home mortgage loan were set forth in a standardized form contract ("the Mortgage Agreement").

1

7. The terms of the Mortgage Agreement required Plaintiff to make periodic payments ("the Escrow Funds") to an escrow account ("the Escrow Account"), from which Quicken would in turn pay (among other things) the real estate taxes on the Home as they become due semi-annually to Pima County.

8. The Mortgage Agreement is a federal mortgage governed by the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 ("RESPA") and its implementing regulation, 12 C.F.R. Part 1024 ("Regulation X").

9. RESPA in pertinent part provides:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.

12 U.S.C. § 2605(g) ("Section 2605(g)").

10. Regulation X in pertinent part provides:

> If the terms of a mortgage loan require the borrower to make payments to the servicer of the mortgage loan for deposit into an escrow account to pay taxes, insurance premiums, and other charges for the mortgaged property, the servicer shall make payments from the escrow account in a timely manner, that is, on or before the deadline to avoid a penalty, ***as governed by the requirements in § 1024.17(k).***

12 CFR § 1024.34 ("Section 1024.34") (emphasis added). The emphasized cite to Regulation X in turn provides:

> If the terms of any federally related mortgage loan require the borrower to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than 30 days overdue.

2

12 CFR §1024.17(k)(1) ("Section 1024.17(k)(1)").

11.  In the closing materials on Plaintiff's loan Quicken included an estimate of the activity in the Escrow Account for the coming year, a true and accurate copy of which is attached as **Exhibit A**. This document reflected Quicken's knowledge of property tax payments due on the Home of $8,127.70 on October 1, 2018 and $8,127.70 due on April 1, 2019. The document also confirmed that Plaintiff's monthly periodic payment for the year would be $4,908.60, of which $3,416.65 would be for principal and interest and $1,491.95 would go into Plaintiff's Escrow Account (collectively, "the Periodic Payment").

12.  Plaintiff thereafter timely paid each monthly Periodic Payment to Quicken in the full amount billed.

13.  On June 1, 2018, Shellpoint began servicing Plaintiff's loan. Upon information and belief, Quicken supplied Shellpoint with the entire closing file on Plaintiff's loan, including notice of the dates and amounts of the semi-annual taxes due on the Home.

14.  On or about June 23, 2018, Shellpoint sent its first monthly statement to Plaintiff.

15.  Plaintiff thereafter timely paid each monthly Periodic Payment to Shellpoint, in the full amount billed.

16.  Although Plaintiff's Escrow Account was at no time delinquent, and at all times had sufficient funds to pay the real estate taxes on the Home as they became due,

3

Shellpoint failed to pay the taxes from the Escrow Account when they became due on October 1, 2018 (and then delinquent on November 1, 2018).

17. Plaintiff on January 23, 2019, notified Shellpoint that, despite available funds in the Escrow Account, Shellpoint had not made the real estate tax payments that were due on October 1, 2018. A Shellpoint representative assured Plaintiff that the taxes would be paid and that Plaintiff would not be responsible for any fees or penalties related to the unpaid taxes.

18. Plaintiff on February 18, 2019, again notified Shellpoint that, despite available funds in the Escrow Account, Shellpoint had not made the real estate tax payments that were due on October 1, 2018. Because Shellpoint professed not to have the tax bill for the Home, Plaintiff provided Shellpoint with a copy of it.

19. Plaintiff in early March 2019 again notified Shellpoint that, despite available funds in the Escrow Account, Shellpoint had not made the real estate tax payments that were due on October 1, 2018. Again, Shellpoint assured Plaintiff that the taxes would be paid and that Plaintiff would not be responsible for any penalties.

20. Shellpoint on March 14, 2019, finally paid the real estate taxes due October 1, 2018, using funds from the Escrow Account.

21. However, Shellpoint on March 14, 2019, also took an additional $553.72 from the Escrow Account, to pay a late payment penalty assessed by Pima County due to Shellpoint's own failure to pay the real estate taxes due on the Home on October 1, 2018.

22. On April 9, 2019, Plaintiff sent an email to Shellpoint, objecting to being charged the $553.72 for Shellpoint's delinquent tax payment, and requesting that

Shellpoint take responsibility for the delinquency.

23. On June 4, 2019, some eight weeks later, Shellpoint provided Plaintiff with a "Loan History Statement" which confirmed (a) that Plaintiff's Escrow Account was never delinquent, and (b) that Shellpoint had taken $553.72 from the Escrow Account to pay the penalties assessed for its own failure to timely pay the real; estate taxes on the Home.

24. Subsequently, by letter dated April 15, 2019, but not delivered to Plaintiff until July 1, 2019 via email, Shellpoint refused to reimburse Plaintiff for the $553.72 it withdrew from the Escrow Account.

25. Because Shellpoint failed to pay the real estate taxes due on the Home on October 1, 2018, Shellpoint violated RESPA Section 2605(g) and the regulations promulgated thereunder (including Section 1024.17(k)(1) and Section 1024.34 of Regulation X), causing Plaintiff actual damages in the amount of $553.72.

26. Because Shellpoint was not authorized by the terms of the Mortgage Agreement to take funds in the Escrow Account to pay penalties or fees incurred by Shellpoint, Shellpoint wrongfully converted Plaintiff's Escrow Funds to its own use.

27. Because Shellpoint was not authorized by the terms of the Mortgage Agreement to take funds from the Escrow Account to pay penalties or fees that Shellpoint repeatedly admitted were its responsibility, Shellpoint was unjustly enriched.

28. Shellpoint has exhibited a pattern or practice of failing to timely make tax payments on behalf of borrowers like Plaintiff from non-delinquent escrow accounts.

5

29. For example, the complaint page maintained by the Better Business Bureau includes following complaints:



**Complaint Type:** Billing/Collection Issues   **Status:** Resolved

07/24/2019

We have paid our escrow account for 2018. This company refused to pay the 2018 tax bill in October 2018. After many contact we received a lein notification from County tax office. I have had to pay the tax and pay the penalty for taxes that I already submitted payment through out last year.



**Complaint Type:** Problems with Product/Service   **Status:** Answered

07/30/2018

This company just took over my mortgage. I contacted them on July 9 to inform them they need to pay my property taxes. They were due July1st. They had it for August 1st. I explained how they were incorrect. I also told the the were NOT suppose to pay the fire department and gave them a one time payment to fix that. 3 weeks later I get a certified letter saying I'm wrong and they want to increase escrow and they have not payed my property taxes. I am now deliquent and have penalties that have effected my credit score.



**Complaint Type:** Billing/Collection Issues   **Status:** Answered

03/01/2018

My primary and secondary mortgages were transferred to Shellpoint May 2017 without any warning ahead of time. My property tax information was entered into the primary loan but my escrow account was attached to my secondary loan. I did not know this until my county informed me in November 2017 that my property taxes were not paid, taxes were due in Oct 2017. After providing county information re taxes due and many phone calls to Shellpoint my property taxes were finally paid in January 2018. Shellpoint said they were going to transfer my escrow account from the second loan to the primary loan, why that was important to do I do not know but it only created another set of problems. They assigned the property tax information to be paid from the primary loan but left my escrow account balance with the secondary loan. They then informed me that I now have an escrow deficit on the primary loan, although it was titled as a "Tax Distribution" and not an escrow deficit on my summary. And that I had to make escrow make up payments to the primary loan all the while they still held my escrow account money with the second loan. I sent letters and made phone calls, every time the response was "We will request an audit of your account" but it was not fixed. I finally got so fed up I demanded that they give me my escrow money from the second loan, that I do not want Shellpoint to pay my property taxes and to remove the property tax payment information and escrow deficit from my primary loan. I will NOT pay any escrow make up payments as I don't want them to pay my taxes when they are due again May 2018. I have made my regular payments in full and on time, but have not paid the escrow deficit they claim I owe. Now I am getting daily phone calls telling me I did not make my full mortgage payment. And my last payment is still showing as "Unapplied", they tell me because it was not a full payment. I have repeated my story to every single person I have spoken to from Shellpoint but am not allowed to speak to someone who can actually make a change or is managing my loans. Shellpoint seems to be a very incompetent business and I don't see how they can have a BBB rating of A+. I managed to get my escrow money returned to me from the second loan but the escrow deficit issue with the primary loan is ongoing today with no end in sight.





## CLASS ALLEGATIONS

30.     Plaintiff accordingly brings all Counts of this action individually and on behalf of the following *nationwide* class of similarly situated Policyowners, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3):

> All persons with loans serviced by Shellpoint in which Shellpoint within the applicable limitations period failed to make timely payment of taxes from their non-delinquent escrow account.

("the National Class").

31.     To whatever extent the Court declines to certify any Count a nationwide class, Plaintiff in the alternative seeks certification of that Count on behalf of the following *statewide* sub-class of similarly situated persons, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3):

7

All Arizona residents with loans serviced by Shellpoint in which Shellpoint within the applicable limitations period failed to make timely payment of taxes from their non-delinquent escrow account.

("the Arizona Sub-Class").

32. The National Class and the Arizona Sub-Class are hereinafter collectively referred to as "the Classes."

33. Excluded from the Classes are: (1) Shellpoint, any entity or division in which Shellpoint have a controlling interest, and their legal representatives, officers, directors, employees, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have in pending or resolved actions against Shellpoint asserted on an individual basis the same claims asserted by Plaintiff in this action.

34. Members of the Classes are so numerous (reasonably estimated in the thousands) that joinder of all members is impracticable. Although the exact number of prospective class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of all members of the Classes in a single action will provide substantial benefits to all parties and to the Court. The identity and contact information for all member of the Classes is readily and objectively determinable from information and corporate records in Shellpoint's possession, custody, or control.

35. Plaintiff's claims are typical of the claims of the other members of the Classes. In particular, the factual grounds for Plaintiff's express breach of contract claim

8

are common to all members of the Classes, premised as they are on the uniform, unambiguous language of the standardized Mortgage Agreement.

36. Common questions of law and fact not only exist as to the Classes, they predominate over any questions affecting individual Classes members. These include, among others:

(1) Whether Shellpoint violated Section 2605(g) and the regulations promulgated thereunder (including Section 1024.17(k)(1) and Section 1024.34 of Regulation X);

(2) Whether Shellpoint converted the funds from the escrow accounts of Plaintiff and the other members of the Classes to pay penalties and fees assessed after Shellpoint failed to make timely tax payments;

(3) Whether Shellpoint was unjustly enriched by its use of funds from the escrow accounts of Plaintiff and the other members of the Classes after Shellpoint failed to pay penalties and fees assessed after Shellpoint failed to make timely tax payments;

(4) The nature and extent of the damages caused by Shellpoint's alleged breach; and

(5) The nature and extent of any equitable, declaratory or injunctive relief to which Plaintiff and the other members of the Classes are entitled as a consequence of Shellpoint's alleged actions.

37. Plaintiff is committed to prosecuting this class action and has retained competent counsel experienced in litigation of this nature. Plaintiff is an adequate representative of the Classes who will fairly and adequately protect the interests of the Classes.

9

38. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages suffered by each individual Classes member do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Shellpoint's conduct. Further, it would be virtually impossible for the Classes members to individually and effectively redress the wrongs done to them. Use of the class action device in this instance presents far fewer management difficulties than alternative methods of adjudication, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

39. Class certification is also warranted under Rule 23(b)(2). A class may be certified under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

40. Certification under Rule 23(b)(2) is appropriate here because the declaratory and injunctive relief sought by Plaintiff are by definition generally applicable across the Classes as a whole.

**COUNT ONE**
**RESPA VIOLATION**
**(Individually and on behalf of the Classes)**

41. Plaintiff repeats and realleges all allegations contained in the Complaint as if set forth separately in this Count.

10

42. RESPA provides for a federal private right of action to enforce Section 2605(g) and the regulations promulgate thereunder (including Section 1024.17(k)(1) and Section 1024.34 of Regulation X). 12 U.S.C. § 2605(f).

43. Here, Plaintiff had a federally regulated mortgage loan which required Plaintiff to make payments to an escrow account from which taxes were to be paid when due, but Shellpoint failed to make the tax payment in a timely manner from Plaintiff's non-delinquent escrow account.

44. Shellpoint's actions violated Section 2605(g), Section 1024.34, and Section 1024.17(k)(1), causing Plaintiff actual damages.

45. Shellpoint has exhibited a pattern or practice of through repeated similar RESPA violations against other borrowers beyond Plaintiff.

46. RESPA provides, in the case of an individual action, for "additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f)(1)(B).

47. RESPA provides, in the case of a class action, for the recovery of "(A) any actual damages to each of the borrowers in the class as a result of the failure; and (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not greater than $2,000 for each member of the class, except that the total amount of damages under this subparagraph in any class action may not exceed the lesser of (i) $1,000,000; or (ii) 1 percent of the net worth of the servicer."

48. In addition to the foregoing statutory damages, in the case of any successful action under Section 2605, Plaintiffs are entitled to the costs of the action, together with any attorneys' fees incurred in connection with such action as the court may determine to be reasonable under the circumstances. 12 U.S.C. § 2605(f)(3).

49. The RESPA "safe harbor" under 12 U.S.C. § 2605(f)(4) is inapplicable to Shellpoint. Shellpoint has not notified Plaintiff of any error, nor has it made any adjustment to ensure that Plaintiff would not be forced to pay the $553.72 in penalties incurred through Shellpoint's nonfeasance (let alone within the statutory time period). To the contrary, Shellpoint has denied that payment of the penalties from the Escrow Account was an error at all.

**COUNT TWO**
**CONVERSION**
**(Individually and on behalf of the Classes)**

50. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth in this Count.

51. Shellpoint was obligated to use the Escrow Funds in a manner consistent with the Mortgage Agreement, RESPA Section 2605(g) and the regulations promulgated thereunder (including Section 1024.17(k)(1) and Section 1024.34 of Regulation X).

52. Shellpoint instead used the Escrow Funds from the Escrow Account to pay penalties or fees incurred by Shellpoint, for which it had repeatedly admitted were its responsibility to pay.

53. Shellpoint's use of the Escrow Funds was thus an act of dominion wrongfully exerted over Plaintiff's personal property that seriously interfered with his

rights therein.

54. Plaintiff and the other members of the Classes have been injured by Shellpoint's actions, including loss of use of the converted escrow funds for other purposes.

**COUNT THREE**
**UNJUST ENRICHMENT**
**(Individually and on behalf of the Classes)**

55. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth in this Count.

56. Shellpoint's use of the Escrow Funds constituted a directly connected but unjustified enrichment of Shellpoint and impoverishment of Plaintiff.

57. The appropriate equitable remedy for unjust enrichment may include, among other things, ordering Shellpoint to conduct a self-audit.

**COUNT FOUR**
**DECLARATORY RELIEF**
**(Individually and on behalf of the Classes)**

58. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth in this Count.

59. An actual controversy has arisen and now exists between Plaintiff and the other members of the Classes, on the one hand, and Shellpoint, on the other hand, as to the propriety of Shellpoint's use of escrow funds to pay for penalties, fees or other costs incurred due to Shellpoint's own nonfeasance or malfeasance in the payment of property taxes.

60. Under the circumstances, Plaintiff and the members of the Classes are

13

entitled to a declaration and injunction that RESPA prohibits Shellpoint from using escrow funds to reimburse itself for penalties, fees or other costs incurred due to its own nonfeasance or malfeasance in the payment of property taxes.

## PRAYER

**WHEREFORE**, Plaintiff prays for an order certifying the Classes as requested herein and judgment:

A. awarding Plaintiff and the members of the Classes compensatory damages in an amount to be determined at trial;

B. awarding Plaintiff and the members of the Classes appropriate declaratory, injunctive or other equitable relief;

C. awarding Plaintiff and members of the Classes attorneys' fees and costs; and

D. providing Plaintiff and the members of the Classes with such further and other relief as deemed just and proper by the Court.

## JURY DEMAND

Plaintiff demands a jury trial of all issues triable by right by jury.

Dated this 19th day of September, 2019.

**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**

By: /s/*Andrew S. Friedman*
Andrew S. Friedman
Francis J. Balint, Jr.
William F. King
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LEADER LAW FIRM**
John P. Leader, Esq.
405 W. Cool Drive, Suite 107
Tucson, AZ 85704

*Attorneys for Plaintiffs*